Civil action. The four actions were originally brought in a justice's court on notes given by the defendant for a 20-horse-power oil engine No. 132538. The notes were dated 9 June, 1914; one for $150, due 1 August, 1914; another for $128.29, due 1 September, 1914, and two for $100 each, due respectively on 1 October, 1914, and 1 November, 1914, and bearing 6 per cent interest from date. All were given under the following contract:
August 5, 1913.
TWIN CITY SUPPLY CO., LEAKSVILLE, N.C.
Items: We hereby propose to furnish and deliver f. o. b. cars at factory as follows: Less 35c. cut freight allowance, one 20-horse-power oil engine complete as per specifications, catalogue 91-A, outfit 1255, except that pulley shall be 16 diam. by 16 face.
Guarantee: The machinery herein specified is guaranteed by us to be of good material, in workmanlike manner; any parts proving defecttive [defective] within one year from date of shipment will be furnished free of charge f. o. b. cars, factory, provided investigation shows are made necessary by inherent defects of either material or workmanship of the machinery furnished; but we assume no liability, nor will we be responsible for damage or delays caused by such defective material or workmanship, nor will we make any allowance for repairs or alterations made by others, unless same are made with our written consent.
Ship to Twin City Supply Co., at Leaksville, N.C. via Southern Railway from Beloit. *Page 377 
Price: We propose to furnish the property as specified herein for the sum of $675, to be paid at our office, shown herein as follows: Terms: $175 upon installation, balance, $500, in four equal payments three months each after shipment. In event of your failure to make payment of any portion of the purchase price when due the whole (317) unpaid balance of the purchase price shall, at our election, thereupon become due. All deferred payments shall be evidenced by notes bearing interest at the rate of 6 per cent per annum from date. (Provisions here for reserving title as security.)
It is a further condition of this proposal that the acceptance of the property when delivered shall constitute a waiver of all claims for damages by reason of any delay, and that you will make good to us any loss or damage to said property caused by fire or otherwise, from the time of delivery to you, as herein stated, until the said property is fully paid for, as provided herein. It is a further condition of this proposal that, when signed by you and approved by an executive officer or local manager of Fairbanks, Morse Company, all the terms and conditions of same shall become binding upon both parties hereto and constitute a contract between us. This proposal is executed in duplicate, and it is expressly understood that it contains all of the agreements pertaining to said property herein specified, and that there is no verbal understanding whatever between us in reference thereto. All items of this proposal are contingent upon and subject to strikes, accidents or other causes beyond our control.
Signed by the plaintiff and accepted by defendant.
Defendant pleaded payment in part, and counterclaimed for $500 as damages for breach of the contract by the defendant. The actions were consolidated by consent and tried together. Plaintiff, having introduced the notes and contract, rested its case, whereupon the defendant offered the following testimony:
J. P. Turner testified: "That he is the defendant and did business as the Twin City Supply Company; that the engine in question was purchased to run a gristmill owned by the defendant, and it was to be installed by the plaintiff, who knew what it was to be used for. The defendant was engaged in the wholesale grocery business and was preparing to go into the mill business, grinding corn to sell at wholesale. The defendant owned the gristmill and the engine was purchased to furnish the motive power for the mill. The engine came and the same person who sold it came to install it. It was installed, but never worked satisfactorily. Sometimes it would lose an hour or so; didn't lose as much time at first as later. Within sixty days after the engine was installed the defendant made complaint by letter to the plaintiff, and in consequence *Page 378 
of that letter another man, supposed to be one of the plaintiff's experts, came to readjust and see what the trouble was. He stayed a day and the engine ran very well while he was there, and then it got back the same as it was. Defendant made another complaint, and in the course of something like three months the same man that came the (318) second time came. He cleaned the points and put in new packing. This man tried to adjust it, took out the piston rod and piston. The second man didn't find any trouble with the points. A third man came after suit had been started and he found the trouble with the points, which were taken out, and he put in a new make. The original points were steel, and he put in German silver points, a better grade. It did not work after a third visit, and, finally, a fourth man came, a different man. This man worked for two days to find the trouble. He finally put in new points. The fourth man came twelve months after the engine was installed, and after that it ran satisfactorily. I did not make any payment at the time the contract was signed, but did make a payment six months after the engine was installed, to Mr. Fleming, the credit man, who came in person. Before the engine was put in good shape it ran about half the time. The notes sued on were signed by the defendant six months after the engine was installed. The engine was installed in November and the notes were executed in June following, and at the time of the visit of Mr. Fleming, and at the same time the $175 was paid. We were having some trouble with the engine at the time of Mr. Fleming's visit. The credit man didn't do anything but make promises to the defendant, provided he would pay and give the notes. At the time the engine had not been properly installed.
Q. Please state the terms and conditions upon which you paid the money to Mr. Fleming, and executed the notes, and state what agreement or promises, if any, he made to you as an inducement for you to pay the money and execute the notes so that he would fix the engine and make it run. (Objection by plaintiff. Sustained. Defendant excepts.)
The notes were witnessed by Mr. Fleming, who signed them the same time the defendant did. The defendant's check for $175, payable to Fairbanks, Morse Company, was handed to Mr. Fleming.
Q. How much service did you get out of that engine from the time that it was first put in use until the visit of Mr. Fleming? (Objection by plaintiff. Objection sustained. Exception by defendant.)
Here the defendant offers, under the objection of the plaintiff, the court ruling the testimony out, the following testimony, to which the defendant excepts. The court, addressing the defendant, said: "Tell what he (referring to Fleming) said." A. "He came there and introduced himself to me and said that he represented the credit department of Fairbanks, Morse 
Company, and he said that these payments were *Page 379 
all due and that he wanted a settlement for the engine. I told him of the trouble we were having and that they had sent two or three men before that time — three, I believe it was — to remedy the trouble, but that they never overcame the trouble. I told him that I refused to pay for the engine until the engine was placed in proper shape so that I could get service from it. He insisted upon a settlement. (319) Finally, he made me the proposition that if I would make the first payment of $175 and give my notes as they are for the balance, they had a man in Danville they would send immediately and let him stay until I accepted it in proper shape. I told him that I had had enough trouble and expense fooling with it; I was anxious to run the business, as I had customers waiting for the product, and, in order to get the engine in shape as quickly as possible, I did it. He said during the next week he would have the man. I made the payments on that promise, but it was sixty days before he came. He finally fixed it in November. The conversation with Mr. Fleming took place on 22 June. The last man fixed the points in November."
Mr. Hendren, speaking for the defendant: "You state that the date of this conversation was 22 June. What conversation are you talking about? The notes are dated 9 June." A. "The date the notes were made is the date of the conversation. I thought that was the date."
Upon the foregoing testimony offered by defendant, defendant proposes to prove damages by way of loss of profits and expenses incurred in help and interest on money invested in the plant for which the engine was to be used.
The court having ruled out this testimony, the defendant submitted to a verdict and judgment in deference to the court's opinion, and appealed to this Court, assigning error in the foregoing ruling.
After stating the case: As the presiding judge gave a peremptory instruction in favor of the plaintiff, holding that in no view of the case could the defendant sustain its counterclaim, and excluding the evidence from the consideration of the jury, we need only consider the validity of this ruling, and not discuss the question of damages. In the view we take of this case it does not involve the question of the authority of an agent to alter the terms of a written contract made by his principal, although it was made through his agency, whether forbidden by its express terms to do so or not (Medicine Co. v. Mizzell, 148 N.C. 387; Piano Co. v.Strickland, 163 N.C. 250, and cases therein cited), nor the other question, whether where the parties reduce *Page 380 
their contract to writing parol evidence can be received to contradict, add to, modify or explain it, in the absence of fraud, mistake or other equitable element. The general rules excluding such evidence, which are relied on principally by plaintiff, are fully conceded, but they do not apply here, as defendant admits that it is bound by the terms of the contract and can not recover for any loss it may have sustained (320) which is provided against in the contract, or forbidden by its terms. This contract is somewhat like the one this Court considered in Allen v. Tompkins, 136 N.C. 208, where it was held that if the buyer of the machinery failed to make any request for new pieces of machinery to take the place of those which had proved to be defective, he could not recover damages, as the contract required that he do so, and that there should be no recovery if the seller complied with this stipulation of the contract and furnished the new pieces but that if application was made for the new pieces, and the seller failed to comply with the request, and to the extent he failed in that duty, he would be liable for the resultant damages. The Court, in that case, remarking that the ordinary rule of damages did not apply, "for the reason that in section 13 of the specification sheet, which forms a part of the contract between the parties, a specific and particular method of remedying original defects in the machinery is agreed upon, said: "The language of that section of the contract is as follows: `We guarantee all machinery and equipment to be first-class in material and workmanship, and to work well for the purposes intended, if properly used. In case of original defects in any machine or part of machine, we agree to make good the defect by supplying a new machine or new part.'. . . The plaintiffs, before using the machinery and making payment, could have demanded a refitting of the machinery by the furnishing of new crusher rollers and a new separator to be in good order and capable of doing the work required of them, and, if those pieces had been furnished of such character, the defendant's liability would have been at an end. That was the contract between the parties. No breach of the contract, by which damage in money could be recovered, was in contemplation of the parties. Such an idea was excluded by the terms of the agreement. The plaintiff's remedy was for new pieces of machinery, refused to furnish them, then, of course, the ordinary rule would apply, and the plaintiff would have been entitled to collect such damages as reasonably flowed from a breach of the contract."
But Kester v. Miller, 119 N.C. 475, is more in point. There the defendants purchased an engine and a boiler to do the work which the sellers had guaranteed for it, and defendant was requested to keep it upon a promise of the sellers to put it in good condition, so as to bring it up *Page 381 
to the guaranty. This they failed to do satisfactorily. Plaintiffs sued upon the notes for the price, and defendants counterclaimed for a breach of the contract and asked for damages. This Court, holding that they were entitled to them, said: "As long as the plaintiffs insisted on the defendants keeping the engine, they, the plaintiffs, promising that they would make it satisfactory and remedy the defect, cannot be heard to say that they are not answerable to the defendants for loss they might subject them to by reason of their course. The contract not (321) having been performed by the plaintiffs, they, instead of forcing the defendants to make the option of receiving the engine and holding them liable for the difference between the contract price and the actual value or reject it, chose to induce the defendants to keep the engine and operate it while they were engaged in trying to put it in the condition guaranteed in the sale. If they saw fit to continue this attempt to remedy the defect it was at their risk and on their own responsibility, and that responsibility continued as long as they, without success, tried to put the engine in a satisfactory condition." That would seem to be exactly like this case in principle. The true meaning of this contract is that for any original defect in the engine the plaintiff should not be liable in damages, provided, on notice thereof to be given by defendant, it replaced any defective part with a new one of the same kind, but without any defect in it, and so that the engine would perform its normal functions and conform, thereby, to the terms of the warranty. There was a good reason for giving the plaintiffs this fair opportunity to make good their stipulation to furnish a good engine, as until it was shaken down and tested out any defect in it would not, perhaps, be discoverable, whereas, by using it a while, defendant would be able to detect any original and "inherent" imperfections in it; but the parties did not contemplate that the plaintiffs should not be liable in damages if any substituted piece itself proved to be defective, for the contract is that they will replace a bad piece with a good one, and any other meaning would make the contract absurd, and plaintiffs, as we understand, do not insist upon any such construction of it. Besides, it was not understood that the plaintiffs would be allowed an unreasonable or indefinite time to make good any defect in the engine, but only a reasonable time for the purpose of doing so. In the contract they had agreed and "guaranteed" that the engine should be of "good material and workmanship," and, if it was not, it would be made so upon application, and it was not intended by the other stipulation, as to how any breach in this respect might be atoned for, that the guaranty itself should be made nugatory. All instruments should receive a sensible and reasonable construction, and not such a one as will lead to absurd consequences or unjust results, and the effect of the stipulation as to furnishing "new parts" should not be carried *Page 382 
beyond what is necessary to give the plaintiffs the full benefit thereof, and should not be in excess of the intention. "It is not the province of a court, however, to change the terms of a contract which has been entered into, even though it may be a harsh and unreasonable one. Nor will the dictates of equity be followed if by doing so the terms of a contract are ignored; for the folly or wisdom of a contract is not for the court to pass upon. Its terms, however onerous they may be, must (322) be enforced if such is the clear meaning of the language used, and the intention of the parties using that language; but the words of a contract will be given a reasonable construction, where that is possible, rather than an unreasonable one, and the court will likewise endeavor to give a construction most equitable to the parties, and which will not give one of them an unfair or unreasonable advantage over the other." 9 Cyc., 587.
Numerous cases are cited in the defendant's brief for the position, and they seem fully to sustain it, that where the seller has failed to comply with his part of the contract or warranty by not supplying the defective parts after receiving notice from the buyer, he thereby waives the stipulation as to substituting "good for bad parts," and the buyer is then remitted to his general right to recover the damages he has sustained by reason of the breach and to the extent that the buyer has breached the contract.
Osborne v. Marks, 33 Minn. 56, 59, is so much like this case in its facts that we desire to refer to it specially among the many cases upon this subject. It was an action upon a contract for the sale of a harvester and binder, with a provision as to curing defects. The Court said, referring to the obligations of the respective parties: "Though, upon a strict construction of the terms, notice is required only when (at any time during the first season) it should be first discovered that the machine failed to work, leaving it for appellant, on that notice, to ascertain wherein the defects lay and correct them, if they could be corrected, or be liable on its warranty if it failed so to do, a more liberal and, probably, the proper construction is that after a first attempt by appellant upon notice to correct defects, the respondent was to give the machine a reasonable trial; and, if upon such trial it failed, to give appellant reasonable notice thereof. But it would be going beyond not only the strict terms but the spirit of the warranty to hold that during the entire first season the respondent should be repeatedly giving notice, and repeatedly giving appellant opportunity to tinker at the machine and try to make it work, and that if respondent kept it over that season, even though appellant failed to permanently cure the defects, it should be conclusively taken to fill the warranty." See, also, Seymour v. Phillips, 61 Neb. 282;Bank v. Durcher, 128 Iowa 413; Osborne v. Henry, *Page 383 70 Mo. App. 19; McCormick v. Finch, 100 Mo. App. 641; Frick v. Fry,75 Kan. 396; Nichols v. Maxson, 76 Kan. 607; Massilon Co. v. Shirmer,122 Iowa 699; Altman v. Richardson, 21 Ind. App. 211; Acme Co.v. Gasparson, 168 Mo. App. 558; Osborne Co. v. Jordan, 52 Neb. 465;Port Huron Co. v. Clements, 113 Wis. 249; Kingman v. Myer Bros.,70 Ill. App. 476; Westinghouse Co. v. Meixel, 72 Neb. 623. Instructive and apposite cases, also, are Detweiler v. Downes, 119 Minn. 44;Lorenz v. Hart, 146 Wis. 261; Randall v. Fay, 158 Mich., (323) 670; McCormick v. McNicholas, 66 Minn. 384.
Detweiler v. Downes, supra, is an especially strong authority in favor of defendant's contentions in this case. It will be found that, in most of the above cited cases, the courts held that such a transaction as the one here between the agent of the seller, who is specially commissioned to adjust the matter of controversy between the parties, and the buyer, by which, upon representations and promises that the machine will be put in good or satisfactory working order, the agent obtains the notes for the price, will amount to a waiver of the stipulation as to supplying new parts for those proved to be defective or for a return of the machine, and enable the buyer to recover his proper damages to the extent he has been injured and within the well-settled rules relating to the assessment of damages in such cases. It is contended also that the plaintiff has accepted the cash payment and the notes, and retained them, and actually sues upon the latter, after having knowledge of what transpired between its agent and defendant, which would amount to a ratification, if found to be true.Osborne v. Jordan, 52 Neb. 645; Randall v. Fay, supra; McCormick v.McNicholas, supra. We could not hold that, where an agent, acting for his principal within the scope of his authority, makes a false promise of reparation for the purpose of inducing the other party to give his notes for an engine bought of the principal, and thereby obtains the notes, the seller is thereby precluded or estopped from claiming damages for a breach of the contract. In this case it appears, and we must assume the evidence to be reliable and true, under the peremptory charge of the judge, that the plaintiff failed to act with reasonable promptness and diligence in performing its part of the contract, by supplying sound parts for the defective ones, and putting the engine in good working order according to its warranty that it should be of good material and workmanship, as there were several unexplained delays and the engine was never in good running condition for a whole year after it was delivered. It would appear strange to us if the law permitted such an injustice, and we do not think that it does give any approval to it.
Our case is not like Frick v. Boles, 168 N.C. 654, for here the defendant had complied with his part of the contract by giving proper *Page 384 
notice of the defects in the engine and requesting that they be remedied, according to its terms. He has failed in nothing, so far as now appears, except in the payment of the notes, and, as against recovery upon them, he is asserting a counterclaim for the breach of the stipulations by the plaintiff. Contracts like this one are somewhat one-sided and should not be too strictly enforced in favor of the seller, but with some regard to the just rights of the buyer.
There was error in the decision of the court for the reasons given.
New trial.
Cited: Fay v. Crowell, 184 N.C. 417 (3f); Ferry Co. v. Fairbanks,Morse Co., 201 N.C. 488, 489 (3f); Mfg. Co. v. Lefkowitz, 204 N.C. 454
(3f).
(324)