Bell v. Pine Needles Country Club, Inc., 2019 NCBC 26.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| MOORE COUNTY | 18 CVS 374 |

WARREN KIRK BELL,

        Plaintiff,

v.

PINE NEEDLES COUNTRY CLUB, INC.; BONNIE MCGOWAN; PAT MCGOWAN; MICHAEL MCGOWAN; SCOTTI MCGOWAN; PEGGY ANN MILLER; KELLY MILLER; BLAIR MILLER; MELODY MILLER; KELLY ANN MILLER; and KNOLLWOOD PARTNERS, LLC,

        Defendants.

**ORDER AND OPINION ON DEFENDANTS' MOTION IN THE CAUSE FOR SPECIFIC PERFORMANCE, PLAINTIFF'S MOTION TO PARTIALLY MODIFY AND TO ENFORCE INCORPORATED SETTLEMENT AGREEMENTS, AND PLAINTIFF'S MOTION TO STRIKE**

1.     **THIS MATTER** is before the Court upon (i) Defendants' Motion in the Cause for Specific Performance of Settlement Agreements and for Injunctive Relief (the "Motion in the Cause"), (ii) Plaintiff's Motion to Partially Modify and to Enforce Incorporated Settlement Agreements (the "Motion to Modify and Enforce"), and (iii) Plaintiff's Motion to Strike Bosworth and Hawkins Affidavits (the "Motion to Strike," and collectively with the other motions, the "Pending Motions") in the above-captioned case.

2.     After reviewing the parties' briefs in support of and in opposition to the Pending Motions, the arguments of counsel at the April 10, 2019 hearing on the Pending Motions, and other appropriate matters of record, the Court decides these matters as set forth herein.

    *Wilson, Reives & Silverman, PLLC, by Jonathan Silverman, for Plaintiff Warren Kirk Bell.*

*James, McElroy & Diehl, P.A., by Fred B. Monroe and Christopher Thomas Hood, for Defendants Pine Needles Country Club, Inc., Bonnie McGowan, Pat McGowan, Michael McGowan, Scotti McGowan, Peggy Ann Miller, Kelly Miller, Blair Miller, Melody Miller, Kelly Ann Miller, and Knollwood Partners, LLC.*

Bledsoe, Chief Judge.

I.

BACKGROUND

3.      Plaintiff Warren Kirk Bell ("Bell") initiated this action against Defendants on April 4, 2018, seeking judicial relief in connection with his minority membership and ownership interests in Pine Needles Country Club, Inc. ("Pine Needles") and Knollwood Partners, LLC.  Before Defendants filed responsive pleadings, both sides reached agreements fully and finally resolving all matters in controversy.  These agreements were memorialized in three settlement agreements (the "Settlement Agreements"), which were signed by all parties.

4.      As part of their settlement, the parties contemplated that the Court would incorporate the terms of the Settlement Agreements into a court order and stipulated to the Court's retention of jurisdiction to enforce the Settlement Agreements through the Court's contempt powers.  The parties jointly moved the Court for the entry of a consent order adopting their Settlement Agreements on August 10, 2018.

5.      After considering the parties' joint motion, the Court concluded that good cause existed to grant the parties their requested relief.  The Court therefore entered a consent order incorporating and adopting the terms of the Settlement Agreements on August 14, 2018 (the "Consent Order").  The Consent Order stated that it "fully

and finally resolved all matters in controversy in this action," with an exception for "those executory matters to be performed pursuant to the Settlement Agreements[.]" (Consent Order Adopting and Incorporating Settlement Agreements 4 [hereinafter "Consent Order"], ECF No. 32.) The Court retained jurisdiction to enforce the Settlement Agreements. (Consent Order 4.)

6.  The first of the Settlement Agreements (the "Pine Needles Agreement") provided for Defendants to purchase Bell's shares (and Bell's children's shares) in Pine Needles and laid out a process by which the appraisal and sale of those shares would occur. The parties agreed that the price for Bell's shares would be determined by a panel of three business appraisers (the "Qualified Appraisers"). (Consent Order Ex. 1 ¶ 4 [hereinafter "Pine Needles Agreement"], ECF No. 32.1.) This panel would be made up of one appraiser selected by Bell, one appraiser selected by Defendants, and a third appraiser chosen by the parties' appointed appraisers. (Pine Needles Agreement ¶ 4.) After gathering any needed information, each of the Qualified Appraisers would tender an independent report containing their appraisal to the parties. (Pine Needles Agreement ¶ 4.) Following a thirty-day period for comments on these reports, during which the parties could agree to a purchase price, the final appraised price of Bell's shares would be determined by a majority vote of the Qualified Appraisers. (Pine Needles Agreement ¶ 4.)

7.  The parties also agreed to certain standards by which the Qualified Appraisers would value Bell's shares. Specifically, the Pine Needles Agreement provided that "[t]he Fair Market Value standard of value shall be applied to

determine the Appraised Value of the Stock." (Pine Needles Agreement ¶ 4.) The agreement further stated that the Qualified Appraisers would apply a "going concern premise of value, assume no material change in either the operation of the Company, or the use of its assets, and assume a valuation date of June 30, 2018." (Pine Needles Agreement ¶ 4.)

8. Additionally, the Pine Needles Agreement allowed the Qualified Appraisers, by a majority vote, to retain a licensed real estate appraiser "to determine the fair market value of the real estate and improvements, as is, . . . owned by [Pine Needles] as a going concern as of June 30, 2018." (Pine Needles Agreement ¶ 4.) Should a real estate appraiser be retained, the agreement provided that the Qualified Appraisers were to "utilize the appraisal performed by the [real estate appraiser]" while performing their own valuations. (Pine Needles Agreement ¶ 4.)

9. The parties appointed their Qualified Appraisers, and a third Qualified Appraiser was agreed upon, by October 5, 2018. The Qualified Appraisers then voted to employ the services of a real estate appraiser, and a candidate was selected by November 19, 2018.

10. On January 15, 2019, Defendants filed their Motion in the Cause. Defendants allege that Bell's selected Qualified Appraiser, Ankura Consulting Group ("Ankura"), and the non-party-appointed Qualified Appraiser, Mark Zyla ("Zyla"), insist that the Qualified Appraisers should be able to direct the retained real estate appraiser to conduct a valuation that considers the "highest and best use" of "excess" or "surplus" land owned by Pine Needles and Mid-Pines Development Group, LLC

("Mid-Pines"), a golf course and resort in which Pine Needles owns a 50% membership interest. Defendants argue that the real estate appraiser and Qualified Appraisers may not consider the highest and best use of company assets under the terms of the Pine Needles Agreement.

11. Defendants' Motion in the Cause therefore requests that the Court (i) order the Qualified Appraisers to conform their work to the terms of the Pine Needles Agreement and direct any retained real estate appraiser to value Pine Needles' real estate assets using a going concern premise of value and assuming no material change in company operation or use of assets, and (ii) order Bell to mandate that Ankura so complies with the Pine Needles Agreement. Defendants also ask that the Court extend the deadline for completion of the appraisal process by ninety days, order that Defendants shall not be required to produce further documents or information to Ankura (excluding previously-agreed-to management interviews), and tax the cost of these enforcement proceedings against Bell.

12. In response to Defendants' motion, Bell filed his Motion to Modify and Enforce. Bell argues that the Pine Needles Agreement does not limit the information the Qualified Appraisers can consider in arriving at their independent valuations of Bell's shares and that Ankura and Zyla should be able to consider the highest and best use of Pine Needles' and Mid-Pines' unused real estate assets to the extent they find such information instructive to their appraisals. Bell also contends that Defendants should not be allowed to interfere with the appraisal process under the Pine Needles Agreement, which states that "the parties waive any right they may

have to contest the determination of the purchase price by the Qualified Appraisers." (Pl.'s Br. Supp. Mot. Partially Modify and Enforce Incorporated Settlement Agreements and Opp'n Defs.' Mot. Specific Performance and Injunctive Relief 4 [hereinafter "Pl.'s Br."], ECF No. 49 (quoting Pine Needles Agreement ¶ 4).)

13. Bell thus asks the Court to order Defendants to cease any efforts to interfere with the appraisal process and to not attempt to dictate further the terms of the Qualified Appraisers' engagements or methodologies. Bell also requests that the Court require Defendants to produce additional documents identified by Ankura and deny Defendants' request for expenses and attorneys' fees. Finally, while Bell agrees that an extension of the appraisal process deadline is required, Bell asks that the Court not set a hard deadline but instead order that the process be completed seventy-five days after the real estate appraisal is finished.

II.

ANALYSIS

14. A party seeking enforcement of a settlement agreement may seek specific performance of that agreement by petition or motion in the original action. *State ex rel. Howes v. Ormond Oil & Gas. Co.*, 128 N.C. App. 130, 136–37, 493 S.E.2d 793, 796–97 (1997). Where that party is entitled to have the settlement agreement enforced, the trial court may enter a judgment in accordance with the terms found in the settlement agreement. *Id.*

15. "Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution."

*State v. Philip Morris USA Inc.*, 359 N.C. 763, 773, 618 S.E.2d 219, 225 (2005) (citing *Lane v. Scarborough*, 284 N.C. 407, 409–10, 200 S.E.2d 622, 624 (1973)). When a written contract clearly expresses the parties' intent such that no ambiguities exist "requiring resort to extrinsic evidence or consideration of disputed facts, the contract may be interpreted as a matter of law." *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 691, 821 S.E.2d 360, 372 (2018) (citing *Lane*, 284 N.C. at 410, 200 S.E.2d at 624).

A.    Compliance with the Pine Needles Agreement's Limiting Assumptions

16.    Looking first at Defendants' concerns about the Qualified Appraisers' chosen methodologies, the Court concludes that the plain meaning of the Pine Needles Agreement's limiting language precludes the Qualified Appraisers, and any selected real estate appraiser, from considering the highest and best use of assets while determining the Fair Market Value of Bell's shares.

17.    The Pine Needles Agreement clearly instructs the Qualified Appraisers that they are to assume "no material change in . . . the use of [Pine Needles'] assets" while appraising Bell's shares. (Pine Needles Agreement ¶ 4.) Thus, while John Levitske, the Senior Managing Director of Ankura, is theoretically correct in his affidavit testimony that a "potential buyer of a company could re-deploy or sell unused, surplus, [or] excess" real estate, (Pl.'s Br. Ex. 1 ¶ 45(d)(ii) [hereinafter "Levitske Aff."], ECF No. 49.2), and that a buyer of a minority position in a company might "assume economically rational and responsible management and deployment of assets," (Levitske Aff. ¶ 45(d)(iii)), in this instance, the parties have contracted that the Qualified Appraisers cannot entertain such potential measures for valuation.

Selling, re-deploying, or changing the use of the real estate assets of Pine Needles and Mid-Pines would necessarily constitute "material change in . . . the use" of those assets, and the parties have agreed that the Qualified Appraisers shall assume no such change will occur while valuing Bell's shares.

18. As to restrictions placed upon the real estate appraiser, the Pine Needles Agreement provides that any selected real estate appraiser is to determine "the fair market value of the real estate and improvements, *as is*, that are owned by [Pine Needles] as a going concern as of June 30, 2018." (Pine Needles Agreement ¶ 4 (emphasis added).) On its own, the plain meaning of the phrase "as is" constricts the real estate appraiser's analysis to a valuation of Pine Needles' and Mid-Pines' real estate assets "[i]n [their] existing condition without modification." *As Is*, Black's Law Dictionary (8th ed. 2004). This language is incompatible with an appraisal considering the real estate assets' highest and best use.

19. Further, when one considers that the Pine Needles Agreement requires the Qualified Appraisers to "utilize the appraisal performed by the [real estate appraiser]," (Pine Needles Agreement ¶ 4), but prohibits the Qualified Appraisers from considering potential changes in asset use, the phrase "as is" can only be read as providing that the real estate appraiser shall assume that Pine Needles' and Mid-Pines' real estate assets will not be altered or used differently in the future. To conclude otherwise would result in contradictory terms: on the one hand allowing a real estate appraiser to conduct a highest-and-best-use valuation and telling the Qualified Appraisers to utilize that valuation, while on the other hand

simultaneously providing that the Qualified Appraisers should assume no change in the use of assets. The Court declines to embrace such an internally inconsistent construction of the Pine Needles Agreement. *See Fairbanks, Morse & Co. v. Twin City Supply Co.*, 170 N.C. 315, 321, 86 S.E. 1051, 1054 (1915) ("All instruments should receive a sensible and reasonable construction, and not such a one as will lead to absurd consequences[.]").

20. For these reasons, the Court concludes that the Pine Needles Agreement provides that neither the Qualified Appraisers nor their selected real estate appraiser are to consider the highest and best use of Pine Needles' or Mid-Pines' real estate assets in performing their engagements under the Pine Needles Agreement. While, as Bell argues, the parties agreed to waive any right to contest the determined price of Bell's shares, the parties also agreed to a specific process for the appraisal of those shares and are entitled to have the Pine Needles Agreement performed. *See Ormond Oil & Gas Co.*, 128 N.C. App. at 136–37, 493 S.E.2d at 797. The Court will therefore order that the Qualified Appraisers and their selected real estate appraiser are not to consider the highest and best use of Pine Needles' or Mid-Pines' real estate assets—regardless of whether those real estate assets are considered used, unused, excess, or surplus—while valuing Pine Needles' assets or Bell's shares.

21. Accordingly, the Court will grant Defendants' Motion in the Cause to the extent it seeks the Qualified Appraisers' compliance with the terms of the Pine Needles Agreement and deny Bell's Motion to Modify and Enforce to the extent it

requests that the Court order Defendants not to challenge the Qualified Appraisers' forecast methodologies.

B. Further Requests for Documents and Information

22. The Court turns next to Defendants and Bell's dispute concerning further disclosures of documents and information, beginning with Defendants' requested relief.

23. Defendants ask that the Court order that Defendants will not be required to produce further documents or information in response to inquiries from Ankura. In support of this request, Defendants argue that it would be inequitable to require them to turn over further documents to Ankura now that the original deadline for the end of the appraisal process has passed. Defendants also contend that some of the document and information requests made by Ankura are motivated by bad faith. Defendants do not object, however, to providing the selected real estate appraiser with further documents and information or to Ankura interviewing the management of Pine Needles or Mid-Pines to gather more information.

24. Bell argues that the Court should deny Defendants their requested relief and presents affidavit testimony from Ankura explaining the proper purpose behind each of Ankura's document and information requests. (Levitske Aff. ¶ 52.) This affidavit testimony goes on to states that while Ankura believes Defendants have not fully responded to its document or information requests, it is willing to address any remaining topics in management interviews in lieu of further information requests. (Levitske Aff. ¶ 53.)

25. In resolving this dispute, the Court again begins with the language of the Pine Needles Agreement, which states that the "Qualified Appraisers may view any of the books or records of [Pine Needles] in conducting their respective valuations including, but not limited to historical and current financial information for [Pine Needles] and [Pine Needles'] assets[.]" (Pine Needles Agreement ¶ 4.) The Agreement also allows the Qualified Appraisers to conduct interviews with the parties to obtain information. (Pine Needles Agreement ¶ 4.) The parties agreed to "cooperate fully with providing documents, interviews, and information requested by any of the Qualified Appraisers." (Pine Needles Agreement ¶ 4.)

26. The wording of the Pine Needles Agreement shows that the parties agreed to give the Qualified Appraisers broad access to a wide range of information about Pine Needles and to cooperate fully with requests for such information. Considering this, the Court concludes Defendants have failed to show that Ankura's document or information requests have strayed outside the scope of information that Defendants agreed to readily provide under the Pine Needles Agreement. Rather, while the Court understands that certain requests made by Ankura may feel personal (such as requests related to family weddings held at Pine Needles' facilities), based upon the evidence before the Court, Ankura appears to have had a valid, appraisal-related reason for making such requests. (Levitske Aff. ¶ 52(c).)

27. Further, the Court concludes Defendants have failed to show how "it would be inequitable for Defendants to be compelled to provide additional documents, or other information" to Ankura "after the original deadline contemplated by the

settlement agreements," (Defs.' Mot. Cause Specific Performance Settlement Agreements and Injunctive Relief 5, ECF No. 35), when Defendants acknowledge that the deadline for the completion of the appraisal process should be extended and have requested such an extension themselves.

28. Accordingly, in light of the plain language of the Pine Needles Agreement, Defendants' and Bell's requests for an extension of the appraisal process, and Defendants' current failure to show that they will be prejudiced by providing further information, the Court will not enter an order prohibiting Ankura, or the other Qualified Appraisers, from making further reasonable requests for documents or information from Defendants. The Court will therefore deny Defendants' Motion in the Cause to the extent it seeks such relief.

29. Turning to Bell's request that the Court require Defendants to produce further documents, the Court notes that certain representations by the parties and Ankura appear to have resolved, for the moment, any need for court involvement. Specifically, (i) Defendants represent they have turned over all responsive documents in their control and possession, (ii) Ankura indicates that it is agreeable to addressing areas of open inquiry through upcoming management interviews, and (iii) counsel for Bell has agreed that there are no documents Ankura currently needs so long as management interviews are allowed and appropriate follow-up information requests are fulfilled.

30. Based upon these representations, and in light of the Court's decision not to prohibit the Qualified Appraisers from making further reasonable requests for

documents or information, the Court will deny Bell's Motion to Modify and Enforce to the extent it seeks to compel Defendants to produce records, documents, or information based on the current record.

C.    Extension of Deadline for Appraisal Process

31.    The Court next examines the parties' differing requests for an extension of time to complete the appraisal process.

32.    Defendants request that the deadline for the appraisal process be extended ninety days.  Bell asks that the Court set a deadline seventy-five days from the completion of the real estate appraiser's work.

33.    At the April 10, 2019 hearing, the Court instructed counsel for both sides to contact the selected real estate appraiser and obtain an estimate of the time it would take to perform the requested real estate appraisal or appraisals.  On April 12, 2019, counsel informed the Court by e-mail that the real estate appraiser estimates he will need seventy days to complete his engagement.

34.    Considering the real estate appraiser's seventy-day estimate, the Court concludes that Bell's proposed extension of time better allows for the real estate appraiser, the Qualified Appraisers, and the parties to efficiently conclude the appraisal process provided for in the Pine Needles Agreement.  The Court will thus grant Bell's Motion to Modify and Enforce to the extent it requests such an extension, deny Defendants Motion in the Cause to the extent it requests a differing extension of time, and extend the deadline for the conclusion of the appraisal process through

and including seventy-five days after the completion of the real estate appraiser's work.

D.    Defendants' Request for Expenses and Attorneys' Fees

35.    Defendants' Motion in the Cause also requests that the Court tax the cost of this enforcement proceeding, including reasonable attorneys' fees, against Bell, citing the Pine Needles Agreement's reciprocal attorneys' fees provision.  Defendants argue they are entitled to such an award because Plaintiff, despite Defendants multiple demands, "refused to instruct [Ankura] to follow the Pine Needles Agreement" while having "the ability and capacity to instruct [Ankura] to abide by the Pine Needles Agreement[.]"   (Defs.' Br. Supp. Mot. Cause Specific Performance Settlement Agreements and Injunctive Relief 13, ECF No. 36.)  After a review of the Pine Needles Agreement and the parties' arguments, the Court disagrees.

36.    Under North Carolina law, "[i]f a business contract governed by the laws of this State contains a reciprocal attorneys' fees provision, the court . . . in any . . . proceeding . . . involving the business contract may award reasonable attorneys' fees in accordance with the terms of the business contract." N.C. Gen. Stat. § 6-21.6(c).

37.    The Pine Needles Agreement contains the following reciprocal attorneys' fees provision:

> If, in any suit, action, proceeding, or arbitration between the Parties involving this Agreement, it shall become necessary for either party to employ an attorney to enforce or defend any of such party's rights, remedies, or obligations hereunder in a court of law . . . , the party substantially prevailing in any such action or proceeding as determined by the court . . . shall be entitled to an award of all reasonable attorneys' fees and expenses incurred[.]

(Pine Needles Agreement ¶ 21.) As used in this paragraph, the designated term "Parties" means the individuals comprising the "Bell Shareholders, the Miller Shareholders, and the McGowan Shareholders," as well as Pine Needles. (Pine Needles Agreement 1.)

38. Reviewing this language, the Court notes that the Pine Needles Agreement does not expressly state which party shall be obligated to pay awarded expenses or attorneys' fees. The Court also notes, however, that while there are multiple parties to the contract, the parties deemed to use the non-designated, binary phrase "either party" to describe the party employing an attorney to enforce or defend that party's rights. The Court concludes that this phrase implies that the attorneys' fees provision contemplates a situation in which at least two of the identified "Parties" are in a dispute involving the Pine Needles Agreement and the action or inaction of one side has necessitated the other's commencing a suit, action, or proceeding, or defending against the same. In essence, the Court concludes paragraph twenty-one of the Pine Needles Agreement provides that where one party or set of parties substantially prevails in a proceeding related to the Pine Needles Agreement, the party or parties whose conduct resulted in the prevailing party or parties litigating the issue must pay awarded expenses and attorneys' fees. *See Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 227, 333 S.E.2d 299, 304 (1985) ("Intention or meaning in a contract may be manifested or conveyed either expressly or impliedly, and it is fundamental that that which is plainly or necessarily implied in the language of a contract is as much

a part of it as that which is expressed." (quoting *Lane*, 284 N.C. at 410, 200 S.E.2d at 625)).

39.     The question before the Court then is whether Bell's action or inaction here necessitated Defendants' Motion in the Cause. After a review of the record, the Court must answer this question in the negative.

40.     Contrary to Defendants' arguments, regardless of whether Bell agreed or disagreed with Ankura's approach to its engagement, Bell did not have control over Ankura such that Defendants' Motion in the Cause could have been avoided. Arbitrators, and appraisers serving in arbitration-like proceedings, are generally not agents of the parties that appoint them, but neutral and disinterested third parties. *See Niagara Fire Ins. Co. v. Bishop*, 39 N.E. 1102, 1106 (Ill. 1894) ("The arbitrators selected, one by each side, ought not to consider themselves the agents or advocates of the party who appoints them. When once nominated they ought to perform the duty of deciding impartially between the parties, and they will be looked upon as acting corruptly if they act as agents or take instructions from the other side."); *Conn. Fire Ins. Co. v. Cohen*, 55 A. 675, 677 (Md. 1903) ("It is fundamental to the conception of such an appraisement, which is in effect an arbitration, that the persons selected to make it should be free from the control or direction of the respective parties whose interests have been confided to them and should act independently and upon their own judgment."); *L.D. Jennings Co. v. N. River Ins. Co.*, 172 S.E. 700, 701 (S.C. 1934) ("[A]rbitrators or appraisers are not agents, representatives, or advocates of the party by whom they are selected[.]"); *Martin v. Vansant*, 168 P. 990, 994 (Wash. 1917) ("To

call an arbitrator an agent is an egregious misnomer, and any attempt to apply to arbitration the rules pertaining to agency is far fetched and impractical."); *see also Carolina-Va. Fashion Exhibitors, Inc. v. Gunter*, 291 N.C. 208, 220, 230 S.E.2d 380, 389 (1976) ("An arbitrator acts in a quasi-judicial capacity and must render a faithful, honest and disinterested opinion upon the testimony submitted to him." (quoting *Fred J. Brotherton, Inc. v. Kreielsheimer*, 83 A.2d 707, 709 (N.J. 1951))). Defendants have not shown an exception to this rule existed here between Bell and Ankura.

41. Indeed, the Pine Needles Agreement provides no method for either Defendants or Bell to exercise control over their respective Qualified Appraisers once each selection was made and does not obligate either side to oversee the performance of its chosen appraiser's duties. Rather, once appointed, each Qualified Appraiser's work is subject to the terms of the Pine Needles Agreement, any engagement documents between the parties and the Qualified Appraiser, and any applicable professional rules of conduct or ethics. Thus, on the basis of the record before the Court, the Court concludes that Ankura is not Bell's agent, *see State v. Weaver*, 359 N.C. 246, 258, 607 S.E.2d 599, 606 (2005) (stating that "the principal's control over the agent" is an essential element of an agency relationship), and that Bell had no ability to unilaterally compel Ankura to change its methodology in response to Defendants' demands.

42. Accordingly, the Court concludes that it was Ankura's and Zyla's forecast failure to follow the Pine Needles Agreement's terms, and not Bell's conduct, that necessitated Defendants' Motion in the Cause. As a result, the Court concludes it

would be improper to require Bell to pay Defendants' expenses, including attorneys' fees, under the Pine Needles Agreement's reciprocal attorneys' fees provision. The Court will thus deny Defendants' Motion in the Cause to the extent it requests an award of such expenses.

E.    Bell's Motion to Strike

43.    Bell moves the Court to strike the affidavits of John T. Bosworth and George Banister Hawkins (the "Bosworth and Hawkins Affidavits"), which were submitted to the Court as exhibits to Defendants' reply brief in support of Defendants' Motion in the Cause. Bell argues that the Bosworth and Hawkins Affidavits introduce new opinions and arguments to the Court in violation of Business Court Rule ("BCR") 7.7, which provides "a reply brief must be limited to discussion of matters newly raised in the responsive brief." BCR 7.7.

44.    Defendants respond to Bell's Motion to Strike by contending that the Bosworth and Hawkins Affidavits reply directly to Bell's arguments supporting his Motion to Modify and Enforce and opposing Defendants' Motion in the Cause. Defendants also ask the Court to summarily deny Bell's Motion to Strike under BCR 7.2 for lack of accompanying brief and BCR 7.3 for failure to consult with opposing counsel before filing.

45.    A trial court's ruling on a motion to strike an affidavit will not be disturbed absent an abuse of discretion. *Blair Concrete Servs., Inc. v. Van-Allen Steel Co.*, 152 N.C. App. 215, 219, 566 S.E.2d 766, 768 (2002).

46. Having carefully reviewed (i) Bell's brief in support of his Motion to Modify and Enforce and in opposition to Defendants' Motion in the Cause, (ii) Defendants' reply brief in support of their Motion in the Cause, and (iii) the Bosworth and Hawkins Affidavits, the Court concludes that the Bosworth and Hawkins Affidavits directly address arguments Bell raised in opposition to Defendants' Motion in the Cause and in support of his Motion to Modify and Enforce. The Court will therefore deny Bell's Motion to Strike.

III.

CONCLUSION

47. **WHEREFORE**, the Court hereby **ORDERS** as follows:

a. Defendants' Motion in the Cause is **GRANTED in part** and **DENIED in part** as follows:

i. To the extent the Defendants seek the Qualified Appraisers' compliance with the terms of the Pine Needles Agreement, Defendants' Motion in the Cause is **GRANTED**. The Qualified Appraisers and their selected real estate appraiser are hereby ordered not to consider the highest and best use of Pine Needles' or Mid-Pines' real estate assets—regardless of whether those real estate assets are considered used, unused, excess, or surplus—in carrying out their engagements. Instead, consistent with the Court's reading of the Pine Needles Agreement, they are hereby ordered to (i) assume a going concern premise of value, (ii) assume

no material change in the operations of Pine Needles or Mid-Pines, (iii) assume no change in the use of Pine Needles' or Mid-Pines' real estate assets, and (iv) assume a valuation date of June 30, 2018.

ii. For the reasons explained above, Ankura is not Bell's agent, and so to the extent Defendants seek an order requiring Bell to mandate that Ankura will comply with the Pine Needles Agreement, Defendants' Motion in the Cause is **DENIED**.

iii. To the extent Defendants request an order providing that Defendants will not be required to respond to further document or information requests from Ankura, or any of the other Qualified Appraisers, Defendants' Motion in the Cause is **DENIED**.

iv. To the extent Defendants request an extension of the appraisal process deadline, Defendants' Motion in the Cause is **DENIED**.

v. To the extent Defendants request an award of their expenses, including reasonable attorneys' fees, Defendants' Motion in the Cause is **DENIED**.

b. Bell's Motion to Modify and Enforce is **GRANTED in part** and **DENIED in part** as follows:

i. To the extent Bell seeks an order from the Court prohibiting Defendants from challenging the Qualified Appraisers' forecast

noncompliance with the terms of the Pine Needles Agreement, Bell's Motion to Modify and Enforce is **DENIED**.

ii. To the extent Bell asks the Court to order Defendants to respond to Ankura's document or information requests, Bell's Motion to Modify and Enforce is **DENIED** based on the current record.

iii. To the extent Bell requests an extension of the appraisal process deadline, Bell's Motion to Modify and Enforce is **GRANTED**. The parties and Qualified Appraisers shall have through and including seventy-five days after the selected real estate appraiser tenders his final appraisal to complete the appraisal process outlined in the Pine Needles Agreement. This extension includes both the time for the Qualified Appraisers to tender their independent reports and the time for the thirty-day comment period provided for by the Pine Needles Agreement.

c. In the exercise of the Court's discretion, Bell's Motion to Strike is **DENIED**.

d. The parties are hereby ordered to provide a copy of this Order to each Qualified Appraiser as soon as practicable.

**SO ORDERED**, this the 23rd day of April, 2019.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge